### PRICE v. STEEL CONST. CO.
### No. 2502.

Court of Civil Appeals of Texas. El Paso.
March 5, 1931.

Rehearing Denied March 26, 1931.

R. A. D. Morton, of El Paso, for appellant.

Hunter, Brown & Brooke, of El Paso, for appellee.

WALTHALL, J.

Guy E. Price brought this suit against the Steel Construction Company, a corporation, alleging that on June 13, 1929, plaintiff and defendant entered into a written contract by the terms of which it was agreed that plaintiff should paint all of the structural steel work furnished by Ingalls Iron Works to and erected by the Steel Construction Company in performance of its contract with Nichols Copper Company in connection with the Nichols Copper Company's refinery near El Paso, Tex.; defendant agreeing in said contract to pay to plaintiff therefor the price of 85 cents per ton of steel painted, defendant to furnish all paint necessary, and plaintiff to do the work of painting, the payment to be made as stated in the contract.

Plaintiff alleges that pursuant to said contract, he painted all of the structural steel work furnished by the Ingalls Iron Works to and erected by defendant on said job aggregating 3,585½ tons; that the payments made by defendant aggregated $2,452.93, leaving a balance due and unpaid of $594.74. Plaintiff further alleged that in addition to the above 600 tons of structural steel work furnished by the Ingalls Iron Works to and erected by defendant on said job which was not painted by plaintiff because defendant, through its agent, F. A. Long, wrongfully refused to permit plaintiff to do the painting on said additional 600 tons, which plaintiff alleges he could and would have done at a profit to himself of 60 cents per ton, or $360. Plaintiff alleges demand and refusal to pay said sums aggregating $954.74, for which he sues.

Defendant answered by general denial, except such parts as are admitted; admits that it entered into the written contract as alleged by plaintiff and on the terms stated; alleged payment in full of all painting done by plaintiff; pleaded the written contract and alleged that it was a part of the contract that plaintiff was to begin work on or before June 20, 1929, and prosecute same with reasonable dispatch; alleged that the contract contemplated that the painting of the structural steel furnished by Ingalls Iron Works and erected by defendant, and that plaintiff was entitled under said contract to paint only such structural steel; that plaintiff decided to paint a portion of the structural steel which was unpainted and advised defendant he could not and would not do same for less than $1 to $1.25 per ton, in violation of the contract, which price he demanded; 'that said price was refused by defendant, whereupon plaintiff replied that it would be all right, that he did not want the work anyway, and that defendant could go ahead; that defendant repeatedly notified plaintiff to proceed with the, painting, which plaintiff refused and declined to do; that plaintiff abandoned the contract and was not entitled to recover.

A jury trial was had and submitted upon special issues. The jury was instructed to make their findings from a preponderance of the evidence. The jury found:

1. The amount of tonnage plaintiff painted on structural steel furnished by the Ingalls Iron Works to defendant and erected on the Nichols Copper Company refinery was 2,885.

2. The amount of tonnage of structural steel furnished by the Ingalls Iron Works to defendant, erected on the Nichols Copper Company refinery required to be painted, and which was not painted by plaintiff, was 508.

3. What would be a reasonable profit to plaintiff per ton for such additional tonnage. The jury answered, "None."

4. The defendant did not refuse to permit plaintiff to finish the painting on the Nichols Copper Company refinery.

5, 6 and 7. To the questions whether it was contemplated by plaintiff and defendant, in the contract between them, that plaintiff was to paint all the structural steel work which defendant was to erect on the Nichols Copper Company refinery, or on only such structural steel work as was to be furnished defendant by Ingalls Iron Works and erected by defendant, the jury answered, Ingalls Iron Works, and no other.

To defendant's issue No. A, the jury answered that the plaintiff, Price, voluntarily quit and abandoned the job before completing the painting.

The court entered judgment that plaintiff take nothing by his suit. Plaintiff presented a motion for a new trial based upon improper remarks of counsel for defendant and mis-

conduct of the jury, which motion the court overruled, to which plaintiff excepted and presents this appeal. Plaintiff brought up the statement of facts covering only the testimony of the jurors on the issue of misconduct of the jury, and not a statement of facts on the trial on. the merits of the case. The trial court made the following finding in overruling the motion for new trial:

"That the evidence is such that a judgment for plaintiff would be rendered if the answers of the jury to the issues had been favorable to plaintiff, and further that the evidence is sufficient to sustain either a favorable or an unfavorable answer for either party to each issue submitted."

## Opinion.

Appellant submits misconduct of the jury on the ground: First. "The jury discussed the result which they thought should be effected, to the effect that Price should not be allowed to recover anything, and after such discussion made their answers to effect such result." Second. "The jury, the first thing after retiring to consider of their verdict, held a short discussion and came to the conclusion that the defendant should win the case, and then proceeded to make their answers to the issues to accomplish such result, and took into account the effect of their answers."

In passing upon the motion for a new trial the trial court stated he was of the opinion that the evidence was sufficient to sustain the jury's findings, and that the evidence heard on the motion failed to show misconduct of the jury. The trial court heard the statements of each of the six jurors. Kaufman said: "We argued about each one of the questions and settled it to the best of our ability." That statement seems to be all of any importance in his answers.

Bischoff, the foreman, said: "When we first went out we had a discussion as to who was right in this case, who ought to recover. * * * We took the questions and discussed each one down the line as they were pro- pounded to us on the judge's charge. * * * I say we discussed the first question first. * * * We took those papers, and as near as I can remember we figured the tonnage as near as we could get. * * * as to what was the discussion that took place regarding question No. 3, well, I don't remember exactly the question. From my own mind, we took. Price's letter in which he stated to the people he was losing money on the proposition."

Carlile said: "We didn't really decide that the defendant ought to win the case until just before we came out. * * * It was generally agreed that Price ought not to have anything; he quit the job and was not entitled to anything. * * * I tried to answer the questions as I thought they should be answered. I did so. * * * I answered

those questions regardless of what I thought the effect would be. I tried to get at the truth. The fact that the jury agreed on was that Price should not have anything; that he was not entitled to anything after he quit. We answered our questions to accomplish that end."

Franks said: "The first (ballot) was taken, and who was to have the verdict, and we decided that it should go to the Ingle Iron Works, I mean the Steel Construction Company, and then the question arose as to how to answer question No. 2, how to arrive at that figure. (The witness then stated how the jury arrived at the answers to the several questions, then) I attempted to answer these questions truthfully as I thought the facts showed them to be. I did so."

Speaking of the issues as to whether Price voluntarily quit the job, witness said: "I answered that because I thought there was no doubt about it."

Witness stated that there was a discussion as to how the jury would arrive at the tonnage, then said: "We went on to question 3, and read it over; and there was some discussion as to how to arrive at that No. 2; we argued back and forth as to how to get at that figure."

Speaking of questions 4 and 5, the witness said: "We disposed of them one after another. We concluded from that that it would be a verdict for the defendant; we knew that perfectly plain. As to whether we tried to figure the questions so as to give a verdict to the defendant, or tried to get at the facts, well, in my mind, he was entitled to nothing whatever. I could not help but conclude that. I say that we decided that he was entitled to nothing and we framed the answers to accomplish that result. What I am trying to get at is that we answered the questions truthfully as we believed the facts to be regardless of the result. We knew when we did do that way that he would get nothing."

Cobb said: "After the jury went out to consider the case, I don't recall any discussion that was had as to who ought to have the verdict, or who ought to win the case. The first discussion that we had was in regard to the first answer. As to whether there was an argument then made that as long as Price had quit his job, thrown up his contract, he ought not to have anything, well, I don't think anything was said about that until afterwards. I recall Price's letter in which he said that he was not making any profit. I recall the letter in which he said, 'believe it or not, there is nothing in it for me on this job.' I guess that affected us in rendering a verdict. * * * I don't know whether that was discussed or not. We certainly tried to answer each one of the questions as we believed the facts showed them to be. I have no doubt about Price voluntarily quitting the job. We could not help believe, from the answers, that he was not entitled to anything. We knew that was going to be the effect, regardless; we tried to answer the questions truthfully. We decided that there was no profit coming to him because he had not done the job, and quit the job."

Broderson said: "After the jury went out to consider the case, we had no discussion as to who should win. We didn't have a discussion of that at all. We never decided who should have the verdict until after we got into the jury room, not until we had talked the matter over. As to after we talked the matter over, what was the discussion as to who should win the case, well, we realized that Mr. Price got paid for what he did and was not entitled to any more. We decided right then that the defendant should win the case. It was not agreed to very quick. It seemed like nearly an hour before it was agreed on. (After some statements as to the discussions on the several issues the witness said:) It was my idea that Price was not entitled to anything, and I undertook to answer the questions to accomplish that result. I answered the questions though as I believed them to be irrespective of the effect. * * * I knew that if I answered them that way (as he believed the facts to be) he could not recover, that was plain to me. As to whether the discussion was that Price was not entitled to recover, well, after we talked it over, we all agreed that he didn't have any recovery coming, and then we proceeded to answer the questions accordingly."

The statute does not define or state what constitutes "misconduct of the jury." Where the ground of the motion for a new trial is "misconduct of the jury," the statute provides that the court shall hear evidence thereof from the jury, or others, and may grant a new trial if such misconduct is proved. A large number of cases have reached the appellate courts on the question of misconduct of juries in the trial of civil cases, and from the opinions in such appeals we may get the principle or rule which governs in the disposition of the question of misconduct of the jury in considering the verdict, and the action of the court on the trial of such issues. Here the trial court acted promptly and fairly and heard the evidence of every member of the jury, and, acting under that discretion given the court on the trial of such issues, found that the evidence did not show misconduct. Where such trial on the issue has been had, we see no good reason why a reversal on appeal should be had, unless the evidence shows some overt act of misconduct on the part of the jury or some one or more of them, which is not made to appear, or where the facts clearly show an abuse of discretion on the part of the trial court on the finding. Houston & T. C. R. Co.

v. Gray, 105 Tex. 42, 143 S. W. 606; Bradley v. T. & P. Ry. Co. (Tex. Com. App.) 1 S.W.(2d) 861.

Some few extracts from the testimony of some of the jurors, disconnected from the remaining parts, would indicate that the jury had agreed in advance of a consideration of the issues submitted and regardless of the evidence to find for appellee, and so framed their answers as to accomplish that result; but considering all that the jurors said we do not think such conclusion tenable as to any one juryman, certainly not to more than two. Without requoting the evidence at length, a few extracts from the evidence indicates that no such agreement was had.

Kaufman said: "We argued about each one of the questions and settled it to the best of our ability. I don't know as anything was mentioned as to who should get the verdict."

Bischoff said: "When we first went out * * * we took the questions and discussed each one down the line as they were propounded to us on the judge's charge."

While Carlile did say, as in appellant's question, "and decided then that defendant should win the case," but Carlile's whole statement does not bear that construction. He said: "They went over the figures on the bills, and we went through them and all. * * * We didn't really decide that the defendant ought to win the case until just before we came out. * * * I tried to answer the questions as I thought they should be answered from the evidence. * * * I tried to get at the truth."

The record does show that Franks said: "And then the first vote was taken, and who was to have the verdict, and we decided that it should go to * * * the Steel Construction Company."

We think from the whole of Franks' testimony, and especially what immediately followed, that the above-quoted statement referred to question No. 1 and the verdict to be rendered on issue No. 1, and that the "it" evidently meant the jury's finding on issue No. 1 should be for defendant, as the jury was then voting on that issue.

Franks also said: "I say that we decided that he (Price) was entitled to nothing and we framed the answers to accomplish that result," and immediately followed that statement by saying: "What I am trying to get at is that we answered the questions truthfully as we believed the facts to be regardless of the result. We knew when we did do that way that he (Price) would get nothing."

Broderson said: "We had no discussion as to who should win. We didn't have a discussion on that at all. * * * We realized that Mr. Price got paid for what he did and was not entitled to any more. We decided right then that the defendant should win the case. * * * It seemed like about nearly an hour before it was agreed on."

Now we do not mean to say that the jury's conduct, in discussing at any time which side should win, was proper. It was not. But we do hold that the evidence does not show, as submitted, "that the jury held a short discussion and came to the conclusion that the defendant should win the case, and then proceeded to make their answers to accomplish such result."

Appellant's bill of exceptions shows: The deposition of F. A. Long was taken by defendant, but the deposition was suppressed by the court before the trial was entered upon, that plaintiff referred to and used parts of such deposition for impeachment purposes; that in his argument to the jury defendant's attorney stated that the deposition was not introduced by the plaintiff and there must have been something in it that was prejudicial to plaintiff, or that plaintiff's lawyer would have introduced it. Exception was taken and the exception overruled. Appellant assigns error. The ground of the objection is not stated in the bill of exceptions as required by article 2237 of the Statutes, and we do not know from the bill of exceptions, or otherwise, whether or not opposing counsel confined himself within the rules of legitimate argument. If appellant's counsel provoked the remark, it may not have been objectionable. Thompson v. Caldwell (Tex. Civ. App.) 22 S.W.(2d) 720, 725, where it is said:

"The bill fails to show that the argument was not made in response to the arguments of opposing counsel, and are, for that reason, insufficient to show error in this respect."

In his argument the attorney for appellee, while discussing issues 3 and 4, said to the jury that if Price voluntarily abandoned his contract he was not entitled to any profits, and that the jury should answer question No. 4, "No," and that, of course, if they did answer that, "No," he (Price) would not be entitled to any profits; they should also answer question No. 3, "None." Appellant's counsel objected; the objection was overruled and appellant assigns error. The bill of exceptions does not state the ground of the objections. While the exception to the statement of counsel is insufficient under the statute, as above pointed out, we are not prepared to say that the reference of counsel to the issues as stated was objectionable. If Price had voluntarily abandoned his contract, and under the record as presented here we must presume that he did, it would follow as a matter of law that he would not be entitled to recover profits, and the issue of profits would be immaterial.

We find no reversible error, and the case is affirmed.

HIGGINS, J. (concurring).

I think the argument of counsel for appellee presents no reversible error. I express no opinion as to the sufficiency of the bill of exception taken to the argument.